UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HENRY CARL RANKIN, | ) | |
|   Petitioner, | ) | |
| | ) | |
|       v. | ) | No.    08 CV 3016 |
| | ) | Hon. David H. Coar |
| UNITED STATES OF AMERICA | ) | |
|   Respondent | ) | |

## GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

The United States of America, by PATRICK J. FITZGERALD, United States Attorney

for the Northern District of Illinois, respectfully submits the following response to petitioner's

Motion To Vacate Sentence Pursuant to 28 U.S.C. § 2255 ("P.Mot").  For the following reasons,

the government respectfully requests that petitioner's § 2225 motion be denied without a hearing.

## BACKGROUND

On February 11, 2003, a federal grand jury returned a two-count indictment against

Petitioner Henry Carl Renken.  R. 11.[1]  Petitioner was charged in Count One with bank robbery

in violation of 18 U.S.C. §§ 2113(a) and 2113(d).  Petitioner was charged in Count Two with

using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).  R.11.

On January 30, 2004, held a suppression hearing with regard to  petitioner's post-arrest

statements.  R. 63.  At the hearing, the government introduced testimony about the circumstances

of petitioner's arrest, confession and consent to search his residence.  Tr. 1/30/04.  As a result of

that hearing, this Court suppressed two sets of incriminating statements petitioner had made

---

[1]  We cite to the record as follows: (1) numbered items in the Official Record on appeal are cited as "R.[document number]"; (2) the transcript of the January 30, 2004, voluntariness hearing is cited as "Tr. 1/30/04 [page number];" and (3) the trial transcript is cited as "Tr. [page number]."

when confronted at his home on November 13, 2002.  R. 68, 81.

On September 2, 2004, petitioner filed a motion to suppress physical evidence that had been seized on the date of his arrest.  R. 85.  That motion was denied by this Court on October 27, 2004. R. 101.  Also on September 2, 2004, the government filed a motion seeking the admission into evidence of certain physical and testimonial evidence deriving from petitioner's second confession which was granted by this Court on October 27, 2004.  R. 87, 100.

A jury trial commenced on February 7, 2005.  R. 110.  During the course of the trial, on February 9, this Court held a hearing outside the presence of the jury and denied petitioner's motion to exclude testimony offered by the government by the handler of a bloodhound which had been used in tracking the bank robber. Tr. 313-79, 379-81.

On February 15, 2005,  the jury convicted petitioner on both counts.  R. 117.  On June 8, 2005, this Court sentenced petitioner to terms of imprisonment of fifty months on Count One and eighty-four months on Count Two, to be served consecutively with one another.  R. 133, 140. Petitioner was also ordered to pay a criminal fine of $25,000, as well as restitution to the bank and bank employee he robbed.  R. 133, 140.

Petitioner directly appealed his conviction. The Court of Appeals affirmed the conviction holding, as relevant here, that this Court's finding that Mrs. Renken voluntarily consented to the officers entering petitioner's residence was not clear error; that this Court's finding that, under the totality of circumstances,  petitioner voluntarily provided written consent for the police to search both his residence and the Chevy Blazer was not clear error; and that, under an abuse of discretion standard, even if this Court's admission of the testimony of Chief Tracz was error, the error was harmless because the evidence against petitioner was overwhelming. *United States v.*

2

*Renken*, 474 F.3d 984, 984-89 (7th Cir. 2007).

All of petitioner's arguments on appeal were denied in *United States v. Renken*, 474 F.3d 984 (7th Cir. 2007). Petitioner's petition for writ of certiorari was denied by the Supreme Court on October 1, 2007. *Renken v. United States*, 128 S.Ct. 135 (2007).

Petitioner's § 2255 motion is timely. *Horton v. United States*, 244 F3d 546,551 (7th Cir. 2001).

## STATEMENT OF FACTS

**The Bank Robbery**

On November 13, 2002, at approximately 4:45 p.m., a tall man wearing a mask and a green hooded jacket entered the NorthSide Community Bank ("NorthSide Bank") in Gurnee, Illinois. Tr. 16, 39-40. The masked man was well over six feet tall, and was wearing jeans and black gloves. Tr. 18-19, 67-68, 105, 154. The robber wore a distinctive jacket with a fur-trimmed hood and an orange lining. Tr. 18, 40, 67, 105, 154. The robber had white skin. Tr. 19, 41. The robber approached a teller, pulled out a gun, and ordered the teller's customer at gunpoint to get on the floor. Tr. 16, 19-20. The robber announced that he was robbing the bank and ordered the teller to fill a bag with cash. Tr. 42. The teller filled the bag with cash, including bait bills with prerecorded serial numbers. Tr. 44.

The robber then turned his gun on a part-time teller at the drive-through window and ordered him to bring cash from his drawer and put it in the bag. Tr. 65-66, 69. This teller did as he was told. Tr. 69-71. Taking the bag filled with money, the robber proclaimed as he left, "You can thank President Bush and the economy for this." Tr. 21, 47, 72, 158, 186. The bank determined that over $18,000 had been stolen in all. Tr. 114-15, 120-22.

3

As the robber fled the bank, a bank officer watched out a window.  Tr. 146, 159.  This witness saw a tall figure wearing a hooded parka pass riding a bicycle very quickly to the east toward the river.  Tr. 160-62.  Very quickly, the police arrived and were informed of which way the robber had gone.  Tr. 164-65, 187.

A Gurnee police officer about a quarter of a mile from the bank responded to the call of a robbery in progress.  Tr. 218-20.  As the officer arrived at the bank, he saw a person wearing a green jacket riding east on a bicycle toward a bike path.  Tr. 221-22, 226-27.  After being notified that the robber had fled the scene on a bicycle wearing a green parka, the officer drove along the bike path until he saw a bicycle some yards off the path.  Tr. 228-29, 235, 240-41.  The officer also heard someone running south through the woods.  Tr. 243.  There was a green Chevy Blazer parked about 20 yards from the bicycle.  Tr. 242-43, 283-85, 289.

At about 6:00 p.m., the Gurnee Police contacted Kevin Tracz, Chief of Bannockburn Police Department.  Tracz was a dog handler, and Gurnee requested the services of his bloodhound in tracking the scent from the recovered bicycle.  Tr. 408, 471.  Tracz arrived at the scene shortly afterwards with his trained bloodhound Daisy May.  Tr. 393-94.  At that time, Daisy May was nine months old and had undergone about six months of training, including 163 training hours.  Tr. 394, 403.  The conditions that evening were cool, moist and damp, which made the trail easier for Daisy May to follow.  Tr. 397, 425.  Daisy May immediately indicated on the Chevy Blazer.  Tr. 413, 415-16.

At about 9:30 p.m. the day of the robbery, petitioner called a long-time friend and requested a ride home from a bar. Tr. 310-12, 316.  Petitioner's friend picked him up and dropped him off four or five blocks from home; petitioner had stated that somebody might be

4

waiting for him at home. Tr. 313-16.

Meanwhile, the police had traced the license plate of the Blazer and had learned that it was registered to petitioner's wife. Tr. 659-61. At about 10:30 p.m. that same evening, the police, along with other law enforcement agents, went to petitioner's home in Lake Bluff, Illinois. Tr. 470-71, 473, 487. When the agents approached the front door, Tr. 487-89, petitioner's wife answered the door. Tr. 488, 525, 529. One of the FBI agents introduced himself and the other officers and explained that they wanted to speak with petitioner. Tr. 488, 525, 529. The FBI agent asked Mrs. Renken if they could come inside. Tr. 488, 525, 529. Mrs. Renken let the agents into the house; she said that her husband was upstairs in the shower. Tr. 489. Two FBI agents and two detectives went upstairs, where they found the bathroom door ajar and they could hear the shower running. Tr. 489-90. FBI agents McCune and Kissinger stepped inside the bathroom and talked to petitioner. Tr. 490, 533. After he dried off and exited the bathroom, petitioner, along with the agents, went downstairs. Tr. 490-91. Mrs. Renken remained in the living room, though she was free to move about the house as she wished. Tr. 532-33.

After petitioner had gone downstairs, Tr. 491, one of the detectives who had gone upstairs noticed through the open bathroom door a pair of black Nike tennis shoes, a pair of blue jeans and a pair of socks on the floor; there was a flannel shirt on the counter. Tr. 492. The detective then entered the bathroom to get a closer look without touching the articles of clothing. Tr. 492-93. The detective observed that the jeans were "dirty and torn," the shoes contained "broken bits of dried leaves [and] branches," and the socks were "extremely soiled" with dirt and particles. Tr. 493, 495.

Once downstairs with the agents, petitioner was questioned about the robbery without

5

having been read his rights.  Tr. 1/30/04 at 42.  After some initial denials, petitioner admitted  the

robbery.  Tr. 1/30/04 at 19-20.  Petitioner was then Mirandized, made a full confession, and

signed a written statement that had been drawn up based on his confession.  Tr. 1/30/04 at 21-23.

  At the same time, petitioner also provided a written consent to search both his residence and the

Chevy Blazer. Tr. 1/30/04 at 26; Tr. 701-05.  Petitioner was taken into custody at approximately

12:30 a.m. Tr. 741.  None of petitioner's incriminating statements were used against him at trial.

      The agents and officers seized from petitioner's residence the blue jeans, Nike shoes, and

flannel shirt that had been in the bathroom, as well as an olive green parka coat with a fur-

trimmed hood from the dining room area that matched the description of the one the robber had

worn. Tr. 498-99, 510-11.  In the pocket of the jeans was a set of keys to the Chevy Blazer.  Tr.

511, 514, 644-45.   Also seized from the residence were utility bills in petitioner's name and a

Harley Davidson bag and receipt. Tr. 540-48, 555.

      At approximately 1:00 a.m. on November 14th, near where the Chevy Blazer and bicycle

had been found, in a wooded area, police found a single dollar bill and a black leather Harley

Davidson glove next to a log; underneath the log was a .22 caliber Sturm Ruger handgun loaded

with 5 rounds and an electronic taser.  Tr. 474-81, 558-81. The handgun was found to be

operable. Tr. 713. The handgun had been purchased by petitioner's mother.  Tr. 603-04, 613-14,

630-35, 683-87.

      At about the same time on November 14th, at a different location within the same

wooded area, another officer found a duffel bag containing, among other things, a face mask, a

Harley Davidson black glove, and approximately $18,500 in cash. Tr. 663-679, 722.   The cash

included the bait bills taken in the bank robbery. Tr. 707-13, 722.  The gloves that were

6

recovered in the wooded area matched gloves purchased later by an FBI agent using the  same product number as indicated on the sales receipt found at defendant's residence. Tr. 714-16, 720. Inside the locked Chevy Blazer, police found petitioner's wallet  containing his driver's license and credit cards, including the credit card used to purchase the Harley Davidson gloves on November 13, 2002. Tr. 384-89, 644-51.

**The January 30, 2004, Voluntariness Evidentiary Hearing**

Prior to trial, petitioner moved to suppress the statements he had made to the agents in his home on the night of his arrest.  R. 33, 77.  Petitioner also moved to suppress physical evidence that had been seized from his home, namely, the olive green parka, the tennis shoes, the blue jeans, the car keys, the proof of residency and some police photos of the scene.  R. 85 at 2.

This Court held an evidentiary hearing regarding the circumstances of that arrest and suppressed defendant's statements.  Tr. 1/30/04.  At that hearing, the government introduced testimony about the events that led the police to petitioner's home.  Tr. 1/30/04 at 3-6, 7.  The testimony established that the officers arrived at Petitioner's home at approximately 10:40 p.m. on November 13, 2002.  Tr. 1/30/04 at 8.  Prior to their arrival, the police had been monitoring the house from some distance away.  Tr. 1/30/04 at 6.

Upon the officers' arrival at the house, Tr. 1/30/04 at 9, petitioner's wife answered the door.  Tr. 1/30/04 at 9.  After the officers and agents identified themselves to Mrs. Renken, they asked if they could speak with her.  Tr. 1/30/04 at 9-10.   Mrs. Renken agreed and invited the officers in.  Tr. 1/30/04 at 10. The officers learned from Mrs. Renken that her husband and child were upstairs.  Tr. 1/30/04 at 10.  Mrs. Renken said that her husband was in the shower.  Tr. 1/30/04 at 10.  The agents and officers told Mrs. Renken that, for their safety, they were going to

7

check the second floor of her home to verify whether or not anyone else was in the house.  Tr. 1/30/04 at 10-11.  Mrs. Renken did not object to this.  Tr. 1/30/04 at 10-11.

Agent McCune located petitioner in the shower of an upstairs bathroom.  Tr. 1/30/04 at 11-12.  Agent McCune identified himself, said that he wanted to speak to petitioner, and waited by the doorway to the bathroom for petitioner to complete his shower and get dressed.  Tr. 1/30/04 at 12, 38.  When petitioner was dressed, agent McCune asked to talk to him and petitioner agreed. Tr. 1/30/04 at 14.  Agent McCune accompanied petitioner downstairs,  Tr. 1/30/04 at 13-14, where they sat at the kitchen table.  Tr. 1/30/04 at 14-15.  Before sitting down, petitioner removed an olive green parka from one of the kitchen chairs.  Tr. 1/30/04 at 15.  Agent McCune noted that the parka matched the description that eyewitnesses had provided of the parka worn by the bank robber.  Tr. 1/30/04 at 15.

The agents began speaking with petitioner at approximately 10:50 p.m.  Tr. 1/30/04 at 16.  Up to that point no firearms had been drawn, and no restraints had been placed upon petitioner.  Tr. 1/30/04 at 16.   Agent McCune asked petitioner how he had spent his day and explained that the officers were there as part of an investigation of the robbery of the NorthSide Community Bank in Gurnee.  Tr. 1/30/04 at  16-17. Petitioner denied any knowledge of the robbery. Tr. 1/30/04 at 17.

McCune then confronted petitioner with reasons to believe that petitioner had been involved in the robbery.  Tr. 1/30/04 at 17.  Specifically, McCune told petitioner that he fit the physical description of the robber, that petitioner's Chevy Blazer had been found parked near the bank, and that the parka in the kitchen matched the description of the parka worn by the robber.  Tr. 1/30/04 at 17, 44-45.  Petitioner persisted in his denial of any knowledge of the robbery.  Tr.

8

1/30/04 at 17, 43.

At that point, Detective Gonzalez from the Gurnee police entered the kitchen.  Tr. 1/30/04 at 18.  Gonzalez informed petitioner that a bloodhound had tracked a scent from the bicycle to petitioner's vehicle.  Tr. 1/30/04 at 18-19.  Gonzalez then asked petitioner if he had made a mistake, and petitioner appeared sad and looked down.  Tr. 1/30/04 at 19.  Gonzalez told petitioner that he should tell the truth, Tr. 1/30/04 at 19, and petitioner then said he had made a mistake and had robbed the bank.  Tr. 1/30/04 at 19.  Agent McCune then followed up with a few questions to determine what the petitioner had done with the money from the robbery and the gun that had been used in the robbery.  Tr. 1/30/04 at 19.  Petitioner told the officers where he had stashed the money and the gun.  Tr. 1/30/04 at 19-20.

The interview was then halted until petitioner was read his *Miranda* rights from a preprinted form.  Tr. 1/30/04 at  20-23.  Petitioner signed the advice of rights form some  twelve minutes after the start of his interview.  Tr. 1/30/04 at 21.

Petitioner then made a full confession of his actions leading up to, during, and after the robbery of the bank that day.  Tr. 1/30/04 at 24.  Agent McCune reduced petitioner's confession to writing, Tr. 1/30/04 at 24, and petitioner read the written statement aloud, initialed each page, and signed and dated the last page.  Tr. 1/30/04 at 24.

In his written statement, petitioner acknowledged that the statement was freely and voluntarily made, that he was 47 years old, that he could read and write, that he was not on any medication, and that he was of sound mind.  Tr. 1/30/04 at  27.  During the course of his interview, agent McCune also learned that petitioner had a college education.  Tr. 1/30/04 at 27.

McCune testified that petitioner was not threatened prior to or during the interview.  Tr.

1/30/04 at 25.  No weapons were drawn and no restraints were used.  Tr. 1/30/04 at 25.  No

promises of leniency were made to petitioner.  Tr. 1/30/04 at 25.  McCune further testified that

petitioner did not appear to be under the influence of alcohol or medication, though in his

statement petitioner stated that he had consumed a beer earlier that day.  Tr. 1/30/04 at 25.

According to McCune, petitioner's mood was cooperative.  Tr. 1/30/04 at 26.

 During the course of this interview, and following the advice of rights and his execution

of the waiver of those rights, petitioner also consented to a search of both the Chevy Blazer and

his residence.  Tr.1/30/04 at 58-59.  Petitioner signed a written consent to search to that effect.

Tr. 1/30/04 at 26, 58-59.  After obtaining the consent to search, agents searched the residence, Tr.

1/30/04 at 63, and recovered the items that petitioner sought to suppress.  The interview, which

had started at 10:50 p.m., concluded at 12:30 a.m., November 14, 2002.  Tr. 1/30/04 at 26.  By

then under arrest, petitioner cooperated in taking the agents to the two locations where he had

concealed the handgun, the proceeds of the robbery, and other evidence.  Tr. 1/30/04 at 30.

 At the suppression hearing petitioner presented testimony from his wife that between

10:30 and 10:45 p.m. on November 13, 2002, she answered the door of her home to find three

men, one in uniform, at her door asking to speak to her husband.  Tr. 1/30/04 at 70.  According to

Mrs. Renken, she could see more men in the yard and one of the men on her doorstep was

carrying a rifle.  Tr. 1/30/04 at 70.  The men stepped into the house without her permission,

according to Mrs. Renken, and some went upstairs to where she had indicated her husband was

located.  Tr. 1/30/04 at 71.  Mrs. Renken testified that she was required to remain in the living

room of the home while the agents and officers went upstairs and came back down with her

husband.  Tr. 1/30/04 at 73-76.  Mrs. Renken did not claim that she had objected to the agents'

entry into the house, that she had been threatened or that the agents had claimed to have some

independent basis for entry into the house.

**This Court's Rulings**

This Court suppressed the statements petitioner made to the agents and officers in the

course of the interview at his home that night.  R. 68, 81.  In its initial ruling, this Court

suppressed the first set of admissions petitioner had made at the kitchen table prior to being given

his *Miranda* warnings, R. 68 at 11, holding that they were made in the course of a custodial

interrogation before petitioner had received notice of his rights.  *Id.* at 11-16.  This Court

declined to suppress the second set of admissions petitioner made that night–the confession and

statement he had given after being notified of his *Miranda* rights and signing the rights

form–because those admissions were voluntary and preceded by adequate warnings.  R. 68 at 16-

22.  In a second ruling after *Missouri v. Seibert*, 124 S. Ct. 2601 (2004), this Court suppressed

the second set of admissions made by petitioner, holding that *Seibert* dictated suppression of

those admissions because of the manner in which petitioner had been questioned first and then

given notice of his rights.  R. 81 at 9-10.  The government did not introduce evidence of those

statements at trial.

But when petitioner sought to suppress the physical evidence seized from petitioner's

home and vehicle the night of his arrest, this Court refused to do so.  R. 101.  This Court held

that the suppression issue turned on the issue of consent, and found that petitioner's wife had

voluntarily consented to the entry of the officers into the residence:

> Here, because defendant's wife was not a minor, does not allege any educational
> or mental deficiencies, and does not allege that the government agents claimed
> independent authority to enter, the Court finds that there was consent to enter the

house. The record does not contain any allegation or evidence that Mrs. Renken verbally or physically sought to deny entry to the agents; in fact, it appears that she gave some kind of implied consent to entry, even if there was no verbal assent to their request to speak to her husband.

R. 101 at 7-8. As for the consent to search that petitioner had signed, R. 101 at 3, this Court had previously held that all of petitioner's interactions with the agents and officers had been voluntary. R. 68 at 20, 22; R. 81 at 3.

This Court rejected petitioner's argument that because the agents had not properly Mirandized him the results of his consent to search must be suppressed. R. 101 at 8-11. Citing *United States v. Patane*, 124 S. Ct. 2620 (2004), this Court held:

Insofar as consent to search is not an incriminating statement, and as long as it is not being admitted for itself, then there is no constitutional violation in admitting evidence seized pursuant to an unwarned confession. If consent is perceived or interpreted as an inculpatory statement, then it will be inadmissible under the self-executing Self-Incrimination Clause. Here, however, the government seeks only indirectly to use defendant's consent to justify its search.

R. 101 at 10. This Court went on, "Under *Patane*, therefore, defendant's argument that physical evidence seized pursuant to his unwarned statements should be suppressed fails." *Id.* at 11.

**Evidentiary Hearing to Qualify Chief Kevin Tracz as an Expert and this Court's Ruling**

During the course of the trial, this Court conducted an evidentiary hearing outside the presence of the jury to determine whether Chief Tracz–the bloodhound handler–was qualified to testify as an expert witness. Tr. 313.

At the hearing, Tracz testified that he had been a dog handler since 2001. Tr. 313-15. His dog, Daisy May, was a pedigreed bloodhound born in January 2002 and raised by Tracz from the age of seven weeks. Tr. 315-16, 319, 327. Tracz belonged to professional associations, including

the North American Search Dog Network, the Midwest Canine Emergency Response Team, and the National Police Bloodhound Association. Tr. 318. Tracz had studied texts on the practice of following scents and using a bloodhound, Tr. 369, and he and Daisy May were authorized by a local municipality for use as a trailing dog and handler. Tr. 318, 363.

Tracz testified as to the theory behind how human scent is detected by the shedding from the human body of skin cell particles called "rafts" and the bacteria they contain. Tr. 321-22. According to Tracz, hundreds of thousands of skin rafts fall off the human body every minute but are not visible to the human eye. Tr. 322. These rafts of skin cells eventually fall to the ground. Tr. 324. The ability of a bloodhound to detect the odor emitted by the rafts is affected by weather conditions, the ideal conditions being cool and moist. Tr. 323, 326. The ideal surface is a moist grassy woodland as contrasted to asphalt or concrete. Tr. 325. Depending on the surface and weather conditions the scent could dissipate in two or three days or remain for five to ten days. Tr. 326. A bloodhound can detect the rafts both on the ground and in the air. Tr. 323. The olfactory system of the bloodhound is the most developed of all breeds of dogs. Tr. 326.

Tracz described how prior to the bank robbery, he and Daisy May had received intensive training for months. Tr. 319-20, 327, 353-54. The two, as a team, had run over 100 separate individual training runs. Tr. 319. The training was limited to finding human scent and consisted of approximately over 160 hours of training over the course of some thirty days. Tr. 320-21, 327, 340. Tracz described the training of Daisy May under varying weather conditions, terrain, scents, and lengths and ages of trails. Tr. 327-32, 335-36. Daisy May's success rate during training was at least 90%. Tr. 346-47. Prior to the bank robbery, Daisy May had been used twice; in those

instances, the results were corroborated either by other tracking dogs or subsequent investigative facts that developed. Tr. 340-43.

In the instant case, Tracz testified, he had presented Daisy May the scent from the bicycle seat; the track had been approximately three hours old. Tr. 348. The scent trail was in a wooded environment and the weather was damp. Tr. 348. According to Tracz, the task of tracking the scent from the bicycle was well within the parameters of the dog's training and presented a beginner's degree of difficulty. Tr. 349. Furthermore, when presented with the scent the feedback from Daisy May was strong. Tr. 349. The results of the track were consistent with other investigative details. Tr. 378.

Tracz opined that Daisy May: (a) was a breed of dog characterized by an acute power of scent; (b) had been trained to follow a trail by human scent; (c) was found to be reliable in the experience of Tracz;   (d) was placed on the trail where a suspect was known to have been within a reasonably short time; (e) the age of the track was reasonable for the dog to get a reliable result. Tr. 349-50. Tracz further opined that the circumstances did not present any problems with respect to contamination such as one would find where an article has been touched by several people. Tr. 350.

After hearing Tracz's testimony, this Court denied defendant's motion in limine to exclude the evidence. Tr. 379. This Court stated:

> There's nothing to indicate that this is bad science. [G]enerally in these cases, there are two issues. One is whether or not it's bad science to begin with, and that's not the case. Then the other is whether or not there's something about this particular transaction here at issue as to whether or not this is a bad application of good science. . . . There's no . . . indication there was anything improper about the performance of the dog or about the methodologies used by the trainer. There was some–indeed, there was some corroboration to what the dog's findings were.

The fact that it was only 90 percent certain is of no particular moment.  That was the testimony, that the dog has performed well in 90 percent of the cases.  It's a question for the jury to determine as to what weight will be applied, but the motion in limine is denied.

Tr. 380-81.

## **ARGUMENT**

I.    **With the exception of his ineffective assistance claim, petitioner's collateral claims are either precluded because the merits of the claims were decided on direct appeal or are procedurally barred by default.**

As a preliminary matter, the majority of defendant's claims are either barred because the merits of the claims were decided on direct appeal or have been procedurally defaulted.  In fact, the only claim that is properly before this Court is defendant's claim of ineffective assistance of counsel, which is appropriately raised for the first time in a motion under 28 U.S.C. § 2255.

Defendant's claims – that of an unconstitutional  search and seizure of his residence and the Chevy Blazer and that his conviction was obtained by tainted evidence through  the admission of Chief Tracz's testimony  – are barred because the merits of these claims were reviewed on direct appeal. *Withrow v. Williams,* 507 U.S. 680, 720-721(1993); *Olmstead v. United States,* 55 F.3d316, 319 Cir.1995).

Defendant's claim – that this Court  limited the scope of his wife's testimony at the voluntariness hearing –  is procedurally defaulted by defendant's failure to raise this claim on direct appeal.

A petition under 28 U.S.C. § 2255 "is not to be used as a substitute for a direct appeal." *See United States v. Barger*, 178 F.3d 844, 848 (7th Cir. 1999).  To bring constitutional challenges under § 2255, "a defendant must make a showing of good cause for, and prejudice from, the failure to raise

the issues on direct appeal." *See id.* A defendant must further show that "the district court's refusal to consider the claims would lead to a fundamental miscarriage of justice." *See McCleese v. United States*, 75 F.3d 1174, 1178 (7th Cir. 1996). In this case, defendant does not succeed in making any of these showings.

However, even if it is assumed that defendant had preserved this issue for review, defendant's motion fails on the merits. The substantive deficiencies of defendant's arguments are discussed below.

Accordingly, petitioner's claims, except for ineffective assistance of counsel, have either been decided on direct appeal or are procedurally defaulted, and should be rejected on that basis alone.

**II.    Petitioner's wife consented to the entry of the officers  into petitioner's residence and the search of petitioner's residence and Chevy Blazer were lawfully conducted pursuant to written consent by petitioner.**

After conducting a voluntariness hearing on January 30, 2004, this Court suppressed petitioner's statements, both prior to and following his being advised of his *Miranda* rights. This Court found that petitioner's wife had voluntarily consented to the entry of the officers into the residence. This Court also found that petitioner had voluntarily signed and consented to a search of his residence and the Chevy Blazer. Not only were these findings amply supported by the factual record cited herein but were upheld on direct appeal. Petitioner's first argument merely rehashes arguments raised previously before this Court and on  direct appeal. Petitioner evens acknowledges he consented  by stating that "Movant believed that there was no use in withholding consent to search a place that had already been searched." *P. Mot.* 10.

16

The argument that his consent to search the Chevy Blazer was invalid because he neither owned nor controlled the Blazer was neither raised on direct appeal (and was thus procedurally defaulted) nor is supported by the facts. True the Blazer was registered to petitioner's wife, but petitioner nevertheless maintained control over the Blazer the day of the bank robbery. As stated herein, the keys to the Blazer were found in a pocket of petitioner's jeans found in the bathroom of petitioner's residence. Daisy May had followed the scent from the bicycle to the locked Blazer, found near where the bicycle had been abandoned, which Blazer further contained petitioner's wallet and other items. Thus, though petitioner's wife was the registered owner, petitioner, at least that day, both drove and maintained control over the Blazer and could thus provide consent to search the vehicle. *United States v. Beshore,* 961 F.2d 1380, 1382-83 (8th Cir. 1992) (defendant's girlfriend had common authority to consent to search of defendant's car where she used the car and put license plates on the car). *See also: United States v. Basinski,* 226 F.3d 829, 834 (7th Cir. 2000)(by allowing another to have actual or apparent control over one's property one assumes the risk that another may consent to a search of that property) .

Accordingly, this claim should be rejected.

### III.    Petitioner was not denied his 6th Amendment right to present evidence when petitioner's wife was precluded from testifying as to her state of mind while she was separated from petitioner while seated in the living room

During the course of the voluntariness hearing this Court sustained the government's objection to petitioner's wife testifying as to her state of mind while she was sitting in the living room separated from petitioner. Tr. 1/30/04 at 73-74. The government argued that the focus of the hearing was the voluntariness of petitioner's statements. This Court ruled that petitioner's wife's state of mind at that point was irrelevant. This Court offered counsel an opportunity to make an offer

17

of proof which counsel declined. *Id.* This Court did not preclude petitioner's wife from testifying as to what happened in the house. *Id.*

Petitioner's 6th Amendment rights were not violated by the exclusion of petitioner's wife's testimony as to her state of mind based upon grounds of irrelevancy. *See: United States v. Ramey,* 24 F. 3d 602, 608 (4th Cir. 1994)( compulsory process not violated by court's terminating defense witness's testimony because irrelevant and confusing), *vacated on other grounds,* 217 F.3d 842(4th Cir. 2000). This Court, therefore, did not abuse it's discretion in ruling on the inadmissibility of this evidence at the hearing. *United States v. Van Dreel,* 155 F.3d 902,905, (7th Cir. 1998).

Accordingly, this claim should be rejected.

## IV.    Petitioner received effective assistance of counsel at the voluntariness hearing.

Petitioner alleges one specific instance of ineffective assistance of counsel at the voluntariness hearing.  Petitioner alleges counsel was ineffective because he failed to question his wife about her physical condition and what medication she was on that night.  The focus of the hearing was the voluntariness of petitioner's statements and his consent to search both the residence and the Chevy Blazer.  Counsel called upon petitioner's wife to testify as to circumstances surrounding  the entry of the officers into the residence and what transpired after that. Petitioner makes unsupported assertions with respect to medication she may have been taking and that he urged counsel to question his wife with respect to that and how this may have affected her.

Counsel's not pursuing this line of questioning may have been strategic. To have brought out the any alleged physical condition of petitioner's wife and the effects of any medication she may have been taking at that time may have  diminished the effectiveness of her testimony by putting into question

18

both her powers of observation and recollection.   Rather than ineffective assistance of counsel, this may have been an effective use of counsel's trial strategy.

In order to prevail on a claim of ineffective assistance of counsel, petitioner must  show that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).   In reviewing the adequacy of defense counsel's performance, this Court "must be 'highly deferential' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  *Canaan v. McBride*, 395 F.3d 376, 384 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 689 (internal quotation marks omitted)).   In other words, the court "presumes that counsel exercised reasonable professional judgment in making all significant decisions and otherwise rendered adequate assistance."  *United States v. Moutry*, 46 F.3d 598, 604-05 (7th Cir. 1995).   The court will not second-guess trial tactics that are rationally based. *United States v. Zarnes*, 33 F.3d 1454, 1473 (7th Cir.1994). *See also United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir.1991) ("It is not our task to call the plays as we think they should have been called. On the contrary, we must seek to evaluate the conduct from counsel's perspective at the time, and must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.").

Morever, petitioner  cannot show that his counsel's performance was constitutionally deficient or that the result of petitioner's voluntariness hearing would have been different were it not

19

for his attorney's alleged errors.  After all, it was as a result of the hearing that petitioner's statements were suppressed.

Accordingly, this claim should be rejected.

**V.    The admission of Chief Tracz's testimony was not error, and even if it was error, it was harmless error .**

The admission of Chief's Tracz's testimony was challenged on direct appeal under an abuse of discretion standard.  The appeals court did express some concern with respect to the reliability of Tracz's methods because of a contamination issue but concluded that "even if the district court had erred in its decision as to the admissibility of the proffered testimony, the evidence in this case was so over-whelming ... that his conviction was not 'inconsistent with substantial justice.' " (citation omitted) *U nited States v. Renken* , 474 F.3d at 989.  At worst the admission of the challenged testimony was harmless error. *Id.*  In any event, the merits of this argument were considered on direct appeal.

Accordingly, this claim should be rejected.

<u>Conclusion</u>

For the reasons stated above, the petitioner's Motion to Vacate Sentence should be denied without a hearing.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    <u>S/Michael O. Lang    </u>
Michael O. Lang
Assistant U.S. Attorney
219 S. Dearborn St., 5th Floor
Chicago, Illinois 60604
Dated: June 25, 2008                    (312) 353-5351

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

was, on June 25, 2008, served pursuant to the district court's ECF system as to ECF filers, if any, and a copy thereof was sent by First Class Mail to the individual identified below:

**Henry C Renken**
#15058-424
Waseca-FCI
P.O. Box 1731
Waseca, MN 56093

By:    s/Michael O. Lang
MICHAEL O. LANG
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5351

21